UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERESA MARIE
RUDOLPH,
        Plaintiff,                    CIVIL ACTION NO. 12-11308

v.                                      DISTRICT JUDGE GERALD E. ROSEN

                                          MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 11, 14)**

Plaintiff Teresa Marie Rudolph challenges the Commissioner of Social Security's ("the Commissioner") final denial of her benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 11, 14). Plaintiff also filed a response (Dkt. No. 15). Chief Judge Gerald E. Rosen referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 3).

**I.    RECOMMENDATION**

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

**II.    DISCUSSION**

    *A.  Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B. *Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III.   REPORT

#### A.   *Administrative Proceedings*

Plaintiff applied for supplemental security income and disability insurance benefits on June 22, 2009, alleging she became disabled on December 1, 2008 (Tr. 88). After the Commissioner initially denied Plaintiff's application, she appeared with counsel for a hearing before ALJ Jerome B. Blum, who considered the case *de novo*. In a written decision, the ALJ found Plaintiff was not disabled (Tr. 14-22). Plaintiff requested an Appeals Council review (Tr. 8). On January 26, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-4).

#### B.   *ALJ Findings*

Plaintiff was 41 years old on her disability onset date in December of 2008 (Tr. 21). She completed some college, and has past relevant work as a bus attendant monitor (Tr. 21). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful activity since her disability onset date in 2008 (Tr. 16).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: tachy-brady syndrome,[1] degenerative disc disease,[2] hypertension, and peripheral polyneuropathy[3] (Tr. 16).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 17).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform the full range of sedentary work[4] (Tr. 17).

---

[1] Also known as sick sinus syndrome, it "is the name for a group of heart rhythm problems (arrhythmias) in which the sinus node – the heart's natural pacemaker – doesn't work properly." *Mayo Clinic* available at http://www.mayoclinic.com/health/sick-sinus-syndrome/DS00930 (last accessed June 11, 2013). Symptoms likely come and go, and often include fatigue, shortness of breath, chest pains, interrupted sleeping, and heart palpitations. *Id.*

[2] Degenerative disc disease is the "gradual deterioration of discs between vertebrae." Michael Perry M.D., *Degenerative Disc Disease (spondylosis)*, Laser Spine Institute, *available at* http://www.laserspineinstitute.com/back_problems/degenerative_disc_disease/ (last accessed June 11, 2013).

[3] Polyneuropathy is "the neuropathy of several peripheral nerves simultaneously[.]" *See Dorland's Illustrated Medical Dictionary*, 1513 (31st Ed. 2007). The goal of treatment is to control symptoms, which can include weakness and sensation changes; the most aggressive treatment is generally given only "if you have difficulty walking or if symptoms interfere with your ability to care for yourself or perform work functions." *Chronic Inflammatory Polyneuropathy*, MedlinePlus, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000777.htm (last accessed June 11, 2013).

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in

At step four, the ALJ found that Plaintiff could not perform her past relevant work as a bus attendant monitor (Tr. 21).

At step five, the ALJ found Plaintiff was not disabled, because she could perform a significant number of jobs available in the economy (Tr. 21, 31-32).

### C. *Administrative Record*

#### 1. **Plaintiff's Hearing Testimony and Statements**

Plaintiff testified that she worked as a school bus attendant for handicapped children: She hooked wheelchairs into the bus, lifted students onto ramps and into seats, and monitored student behavior (Tr. 37). On December 1, 2008, Plaintiff injured her back while shoveling snow (Tr. 38). Plaintiff said that this injury prevents her from working (Tr. 38, 50).

Plaintiff has treated with Dr. Arbit – a rehabilitation specialist – since 2008; as of August 2010, Plaintiff was seeing Dr. Arbit once every two months for back injections and exercises (Tr. 38). Previously, Plaintiff had been seeing Dr. Arbit once a month (Tr. 38). Plaintiff testified that she continues to experience back pain and reports that it affects her walking (Tr. 40). Plaintiff estimated ten to twelve bad days of back pain each month; the pain endures from hours to a few days (Tr. 40). On bad days, Plaintiff cannot do any household chores; on good days, Plaintiff can do very few household chores (Tr. 40). Plaintiff estimated that she could walk a block, depending on the day (Tr. 39).

For relief, Plaintiff takes pain medication and has been receiving injections in her spine (Tr. 38-40). The side effects include headaches, upset stomach, and fatigue (Tr. 41, 49).

---

carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

Plaintiff also described chronic cardiovascular issues, which cause her fatigue and difficulty breathing (Tr. 42-46). She has had high blood pressure for fifteen to twenty years; a pace maker since 2003; and has been regularly seeing her cardiologist, Dr. Karabajakian, for checkups and blood pressure episodes that put her in the hospital (Tr. 42-44). She takes four or five different medications for cardiovascular issues (Tr. 44-45).

Plaintiff testified that she has been to the hospital "lots more than ten" times for high blood pressure episodes (Tr. 45). During these episodes, she gets severe headaches, nosebleeds, shaking, fatigue, and she turns "beet red" (Tr. 45). At the hospital, Plaintiff is typically given an IV, blood pressure medication, and pain medication; she generally remains hospitalized for five to six hours, often resulting in overnight stays (Tr. 46).

Plaintiff stated that she has migraines one to two times a week: during the wintertime, Plaintiff experiences migraines two to three times a month, and during the summer months, her migraines are more frequent – two to four times a month (Tr. 47-48). Her migraines typically last from a number of hours, up to four days (Tr. 48). They cause her horrible pain, blurred vision, and aches over her whole body (Tr. 48). For relief, Plaintiff lies in a dark, quiet room with a towel over her face (Tr. 48). Plaintiff testified that she has had these cardiovascular problems – including uncontrolled blood pressure – for years prior to her alleged disability onset date, and while she was still working (Tr. 49-50).

### 2. Medical Evidence

On December 1, 2008, Plaintiff suffered a severe lumbar strain while shoveling snow; she was given pain medication and advised against any strenuous exercise or action (Tr. 302). On December 8, 2008, Plaintiff reported that, while still painful, her injury felt 35% better, and

on December 30, 2008, she reported that she was 50% better, and physical therapy was helping "a lot" (Tr. 294, 300). Pradip Shah, M.D. examined Plaintiff a few days after her injury, and found that her AP (Anterior Posterior) and lateral lumbar spine revealed no evidence of compression fracture or subluxation,[5] no evidence of disc space narrowing, normal sacroiliac joints, and minimal marginal osteophyte[6] changes at L2-3 and L3-4 levels (Tr. 353).

On January 26, 2009, Stephen E. Boodin, M.D. saw Plaintiff for a surgical evaluation (Tr. 292). He determined that she did have a lumbo-sacral strain, but imaging did not support a diagnosis of symptomatic disc herniation; Dr. Boodin recommended against surgery and determined that physical medicine and rehabilitation was the best course of action (Tr. 292-93).

At the time of her fall, Plaintiff had a long history of cardiovascular issues.[7] Plaintiff regularly saw her cardiologist throughout 2009. On January 21, 2009, pacemaker interrogation showed appropriate pacing and sensing functions with no evidence of pacer compromise, and Dr. Karabajakian noted that Plaintiff's recent lower back injury had aggravated her chronic lower

---

[5] Subluxation is defined as an incomplete or partial dislocation; or, in chiropractic terms, any mechanical impediment to nerve function. *See Dorland's Illustrated Medical Dictionary* at 1817.

[6] Commonly referred to as bone spurs, osteophytes are smooth growths of bone that form over a prolonged period of time. *See* John H. Schneider, M.D., *Bone Spurs (Osteophytes) and Back Pain*, spine-health.com, *available at* http://www.spine-health.com/conditions/arthritis/bone-spurs-osteophytes-and-back-pain (last accessed June 12, 2013).

[7] In 2007, Plaintiff presented to the ER on August 24, with complaints of a headache (Tr. 513); and, on December 29, complaining of head pain after falling on ice (Tr. 172, 500). Plaintiff presented to the ER numerous times in 2008, many of which – but not all – were rooted in complaints related to her cardiovascular history or pre-existing back pain (Tr. 201, 218-21, 230, 255, 265, 475-78, 487-89; *cf.* Tr. 193, 212-15, 223). Plaintiff also regularly saw her cardiologist, Dr. Karabajakian, throughout 2008 for uncontrolled hypertension, cardiovascular issues, and with recurring complaints of headaches (Tr. 248-49, 251-53, 256). During the same year, Plaintiff did present to the ER on other occasions for issues not relevant to this matter (e.g., a dry cough) (Tr. 704, 715-19).

back pain (Tr. 237). On February 19, 2009, Plaintiff reported no complaints of headaches, chest pain, shortness of breath, palpitations or blurred vision during her check-up with Dr. Karabajakian (Tr. 236).

Plaintiff also regularly saw her physician, Steven Arbit, M.D., throughout the year. On April, 29, 2009, Plaintiff reported that her headaches were gone (Tr. 418). He noted that Plaintiff was looking "a lot better in terms of her total being" (Tr. 418). Dr. Arbit found that Plaintiff's walking had improved; she had a reasonable range of motion of her left side; her strength and reflexes were intact; and, she had a negative straight leg raise (Tr. 418). Dr. Arbit stated that he would "keep her off of work because [he] d[id] not think she could go back unrestricted" (Tr. 418). Dr. Arbit kept Plaintiff on her current medication and asked that she return in a month (Tr. 418).

Plaintiff presented to the ER numerous times in 2009, complaining of symptoms related to cardiovascular and back impairments: on February 19, with high blood pressure and an accompanying headache (Tr. 276-77); on August 22, with a three day headache (Tr. 769, 776); and, on October 12, with complaints of lower back and neck pain after she fell off her deck – notes indicated that she was ambulatory, with a slow gait, and x-rays taken of the cervical spine were normal (Tr. 457-60). Plaintiff presented to the ER on October 21, with elevated blood pressure and a headache; both symptoms improved upon treatment at the ER (Tr. 595, 755-57).

On May 21, 2009, Plaintiff followed up with Dr. Karabajakian for continued cardiovascular care (Tr. 235). She reported no palpitations or headaches, and Dr. Karabajakian continued his standard course of care, advising that Plaintiff follow up in three months (Tr. 235).

In May of 2009, Plaintiff told Dr. Arbit that her pain was worse, and was subsequently referred to Jason Schwalb, M.D.; Dr. Schwalb did not recommend surgery (Tr. 449). In June of

-9-

2009, a lumbar myelogram was conducted on Plaintiff (Tr. 384). The results showed minimal disc protrusions at two levels without foraminal stenosis[8] (Tr. 386-87). In October of 2009, Plaintiff treated with Dr. Arbit, reporting that her pain level was a 5 out of 10 (Tr. 446). Dr. Arbit noted that, although Plaintiff had some lower back tenderness, she had normal strength, reflexes, and sensation (Tr. 446). Dr. Arbit reduced Plaintiff's recommended visits to once every *two* months, and when Plaintiff followed up in December, he noted that Plaintiff had a good range of motion in her back, normal leg strength, and minimal tenderness in her lower back (Tr. 445).

Plaintiff presented to the ER numerous times in 2010, complaining of symptoms related to cardiovascular and back impairments: on March 4, with a headache that began when she woke up and persisted into her evening ER visit (Tr. 661-62); on April 11, noting a headache every day and 1-2 migraines per month (Tr. 694); on July 5, with an acute migraine headache lasting two to three days, and accelerated hypertension – she was discharged after pain medications resolved her headache (Tr. 785-87). Plaintiff also continued to see Dr. Karabajakian in 2010 for adjustments to her medications, and Plaintiff continued to have a regular heart rate and rhythm (Tr. 235, 236-37, 251, 571-73, 579).

On March 17, 2010, Plaintiff saw Dr. Karabajakian; his notes indicate that Plaintiff was "complaining of some mild headache[, and h]er predominant pain is related to her lumbar discomfort, lumbar back pain, which she has had previously" (Tr. 590). She also complained of her migraine headache and poor sleep over the last week (Tr. 590). Dr. Karabajakian did not recommend any further testing (Tr. 579).

---

[8] Foraminal stenosis occurs when the passage through which the spinal cord runs becomes clogged. *Foraminal Stenosis*, Cedars-Sinai, *available at* http://www.cedars-sinai.edu/Patients/Health-Conditions/Foraminal-Stenosis.aspx (last accessed June 11, 2013). Symptoms may include numbness, weakness, burning sensations, tingling and "pins and needles" in the arms and legs. *Id.*

On April 30, 2010, the ALJ wrote a letter to Dr. Malcolm A. Brahms, an orthopedic doctor, asking for his professional opinion about Plaintiff's impairments (Tr. 431, 438). Dr. Brahms interpreted objective medical exams: A January 8, 2009 EMG was a slightly abnormal report; Plaintiff's June 2, 2009 physical exam reported no evidence of motor, sensory, or reflex changes; and her June 10, 2009 myelogram reported no foraminal stenosis (Tr. 432).

Dr. Brahms found that Plaintiff was capable of light activity, but must avoid: repetitive lifting below waist level; stairs, ladders, ropes, scaffolds, heights, and hazardous machinery; and stooping and crawling (Tr. 432). Dr. Brahms also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical), and found that Plaintiff could: frequently lift up to 20 pounds and carry up to 10 pounds; occasionally carry up to 20 pounds; sit for six hours in an eight-hour workday; stand and walk for two hours in an eight-hour workday; frequently use her hands and feet; but, could never be exposed to unprotected heights or moving mechanical parts (Tr. 432-38). Plaintiff did *not* require the use of cane to ambulate, and could: occasionally operate a motor vehicle; be exposed to extreme cold, heat, and vibrations; and, tolerate moderate noise (Tr. 432-38). Dr. Brahms also found that Plaintiff's physical impairments did not impede any of the activities listed on the form (432-38).

On May 3, 2010, Dr. Arbit saw Plaintiff for continued evaluation: he remarked that she was doing "okay," but was "not as compliant with her home exercises as [he] would [have] like[d]" (Tr. 441). Plaintiff's physical examination revealed "good" range of motion of her lumbar spine, normal strength, and symptoms of peripheral neuropathy (Tr. 441).

### D. Plaintiff's Claims of Error

-11-

Plaintiff argues that the ALJ's decision was not based on substantial evidence because he: (1) improperly discounted Plaintiff's credibility; (2) improperly considered the opinion of Dr. Brahms; and (3) failed to properly weigh medical opinion evidence. For the reasons stated below, each of these arguments should be rejected.

### 1. Plaintiff's Credibility

Plaintiff primarily argues that the ALJ erred by failing to properly evaluate Plaintiff's credibility.

The Sixth Circuit has discussed the analytical framework for evaluating subjective complaints:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan v. Sec'y of HHS,* 801 F.2d 847, 853 (6th Cir. 1986); s*ee* 20 C.F.R. § 1529(b). Once an underlying impairment that could reasonably be expected to produce Plaintiff's symptoms has been shown, the ALJ must then evaluate the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her ability to perform basic work activities. 20 C.F.R. §§ 404.1529(c), 416.929(c). This determination requires the ALJ to assess the credibility of Plaintiff's statements about her symptoms and their functional effects, i.e., the degree to which those statements can be believed and accepted as true. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); SSR 96-7p, 1996 WL 374186 at *2, 4.

In assessing the credibility of Plaintiff's statements, an ALJ is required to consider all of the evidence in the record, including enumerated factors in the agency regulations. *See* 20 C.F.R.

§ 404.1529(c). If the ALJ rejects Plaintiff's testimony because of an adverse credibility finding, the reasons for that finding must be clearly stated. *Felisky v. Bowen*, 35 F.3d 1027,1036; *see also* 20 CFR § 404.1529; SSR 96-7p.

The ALJ found that Plaintiff had medically determinable impairments – a heart condition, hypertension, and lower back pain – which could reasonably be expected to produce the alleged symptoms (Tr. 17).

In his evaluation of Plaintiff's subjective complaints, however, the ALJ did not find fully credible Plaintiff's statements concerning the intensity, persistence and limiting effects of her conditions (Tr. 17). Specifically, the ALJ found that, although Plaintiff was credible as to her complaints of fatigue and pain with heavy lifting and prolonged walking and standing, her allegation that she was incapable of *all* work activity was not credible (Tr. 18).

Plaintiff argues that the ALJ erred because his credibility finding was not supported by substantial evidence; Plaintiff alleges that the finding was simply "boilerplate" (Dkt. No. 11 at 18-19). However, the ALJ *does* go on to discuss at length the specific inconsistences between Plaintiff's statements; daily activities; and medical evidence of claimant's hypertension, tachy-brady syndrome, and back injury (Tr. 18-20).

First, the ALJ noted inconsistences with respect to Plaintiff's cardiovascular issues, including migraines. Plaintiff alleges that her migraine and heart problems render her completely disabled, yet she testified that she had been working for 15 to 20 years with those very symptoms and only stopped working after her back injury in December of 2008 (Tr. 19, 38, 50).

Second, the ALJ noted the following inconsistencies with respect to Plaintiff's back injury: Plaintiff reported that physical therapy had helped her back condition, and noted a 50% improvement in her back approximately one month after her injury (Tr. 294, 300); Dr. Arbit

-13-

reduced her follow-up visits from once a month to once every two months (Tr. 38, 445); and Dr. Arbit's treatment notes indicated that Plaintiff's condition had not worsened, and she had a normal range of motion (Tr. 441, 445). The ALJ referred to various portions of the medical evidence, which indicated that the results of Plaintiff's medical tests were largely normal, including the findings of two separate specialists, each of whom recommended against surgical intervention (Tr. 449, 292-93).

The ALJ also clearly stated the way in which Plaintiff's reported daily activities factored into his assessment of Plaintiff's credibility:

> Although the claimant has alleged that her impairments prevent her from sustaining work in *any capacity*, the record of evidence establishes that she has substantially greater functional capabilities. At one point or another in the record, the claimant has reported the following daily activities: able to clean, cook, drive, and shop, wash dishes, care for a pet, care for a minor child, does laundry, and (with the exception of dressing taking longer) has no problems attending to her personal care.

(Tr. 20) (emphasis added). The ALJ clearly stated reasons for his credibility determination, and those reasons were supported by substantial evidence in the record. This Magistrate Judge thus defers to the ALJ's evaluation of Plaintiff's credibility. *See Myers v. Richardson*, 471 F.2d 1265, 1266-67 (6th Cir. 1972).

### 2.   Medical Opinion of Dr. Brahms

Plaintiff urges this Magistrate Judge to strike the opinion of Dr. Brahms, because the ALJ did not follow procedures governing an ALJ's request for Dr. Brahms' expert medical opinion. Specifically, Plaintiff argues that the ALJ was required, under the Social Security Administrative Hearing, Appeals and Litigation Law Manual ("HALLEX"), to:

> "[b]efore releasing interrogatories to the ME, . . . transmit the proposed interrogatories to the representative with a copy to the claimant. . . to determine if they object to the use of interrogatories in general, object to any particular interrogatory, or wish to propose other interrogatories."

HALLEX I-2-542(C). In this case, the ALJ's letter to Dr. Brahms requesting his professional opinion on Plaintiff's impairments does not indicate that Plaintiff or her counsel was copied on the letter (Tr. 231).

However, the HALLEX regulations are not considered binding authority in the Sixth Circuit. *Walters v. Comm'r of Soc. Sec.*, Case No. 11-15171, 2013 WL 1364719, at \*15 (E.D. Mich. Mar. 12, 2013) *report and recommendation adopted,* Case No. 11-CV-15171, 2013 WL 1364712 (E.D. Mich. Mar. 29, 2013). HALLEX is merely a Social Security Administration policy manual that provides "guiding principles, procedural guidance and information" to ALJ's. *See Bowie v. Comm'r of Soc. Sec.,* 539 F.3d 395, 397 (6th Cir. 2008). And, although HALLEX offers procedural guidance which *may* be considered, "[t]he fact that something is or is not mentioned in Hallex is not a basis for disturbing the Commissioner's decision." *Id.* at 399; *Morris v. Comm'r of Soc. Sec.*, 1:11-CV-154, 2012 WL 4953118, at \*12 (W.D. Mich. Oct. 17, 2012). Therefore, Plaintiff's argument should be rejected.

Furthermore, Plaintiff's counsel did not object to the receipt of Dr. Brahms' opinion into evidence; rather, at the hearing's start, Plaintiff's counsel took notice that the ALJ had sent Dr. Brahms a letter (Tr. 35). Counsel then expressed concern to the ALJ that Dr. Brahms did not review Plaintiff's most recently submitted medical records (Tr. 35). In response, the ALJ stated that he would take that factor into consideration, and Plaintiff's counsel made no further mention of this during the hearing (Tr. 35). Plaintiff nevertheless revisits this point in her brief, arguing that Dr. Brahms' opinion ought to be rejected because he did not review the entire medical

record. This argument should fail as well. The ALJ did as promised and reasonably discounted the weight that he afforded to Dr. Brahms' opinion accordingly: "Considering he did not have access to the complete medical file, the undersigned gives his opinion weight only to the extent that it is consistent with the lower exertional level residual functional capacity as listed above" (Tr. 20).

Because Plaintiff sustains no argument justifying that the opinion of Dr. Brahms be stricken from the record, this Magistrate Judge finds that the ALJ did not err by considering Dr. Brahms' opinion.

### 3. Treating Source Rule

Plaintiff also argues error in the ALJ's application of the treating source rule, but fails to cogently substantiate this argument beyond citations to treating source precedent and references to Plaintiff's issues with the admission of Dr. Brahms' testimony. Plaintiff does not even specify the treating physician whose opinion ought to have been given controlling weight. Plaintiff simply notes: "we have [here] multiple practitioners, two specialists, and multiple doctors at the hospitals" (Dkt. No. 11 at 16). Plaintiff's contentions here should therefore be waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to ... put flesh on its bones.").[9]

---

[9] Plaintiff makes a number of other unsubstantiated arguments:

> Plaintiff takes issue with the ALJ's reliance on the findings of physicians employed by the Disability Determination Services, arguing error because the ALJ's decision relies on

## IV. CONCLUSION

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to

---

"non-existent evidence" (Dkt. No. 15 at 4). Although the ALJ does not explicitly refer to it, the record does indicate a physical RFC assessment, signed by Kimberly Koch, a non-physician Single Decisionmaker, on July 23, 2009 (Tr. 20, 423-30). Assuming that this is what the ALJ refers to, he mistakenly characterizes it as "[RFC] conclusions reached by the physicians employed by the State Disability Determination Services" (Tr. 20). Nevertheless, Plaintiff does not explain how this rises to the level of reversible error.

Plaintiff argues that a combination of impairments might, taken together, equal a listing (Dkt. No. 11 at 12; Dkt. No. 15 at 9); but, Plaintiff fails to state what listing Plaintiff's collective impairments would qualify her for.

Plaintiff also argues that the ALJ failed to consider the debilitating effects of Plaintiff's hypertension condition on Plaintiff's basic work activities (Dkt. No. 11 at 7-8). To support this, Plaintiff cites to various treatment notes from visits with her treating physicians and visits to the hospital. However, Plaintiff supports this argument with no evidence of how these subjective symptoms or hospital visits render her completely unable to work.

These arguments should likewise be waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon

Mark A. Randon

United States Magistrate Judge

Dated: June 13, 2013

*Certificate of Service*

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 13, 2013, by electronic and/or ordinary mail.

*s/Eddrey Butts*

*Case Manager for Magistrate Judge Randon*
